STATE of Missouri, Respondent,

v.

Andrew NOVAK, Jr., Appellant.

No. 53230.

Supreme Court of Missouri
Division No. 1.

June 10, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Lindell R. Church, Sp. Asst. Atty. Gen., Springfield, for respondent.

Homer N. Mastorakos, Robert J. Koster, St. Louis, Cook, Murphy, Lance & Mayer, St. Louis, of counsel, for appellant.

HIGGINS, Commissioner.

Appellant was convicted by a jury of burglary second degree and stealing. Sections 560.070 and 560.110, V.A.M.S. Pursuant to that verdict and upon finding nine prior felony convictions for burglaries, carrying concealed weapons, and possession of burglary tools, the court assessed appellant's punishment at imprisonment for ten years for burglary and five years for stealing, and sentenced him to the custody of the Department of Corrections, the sentences to be served concurrently. Sections 556.280, 560.095, 560.110, V.A.M.S.

Appellant does not question that the state made a case and the record contains ample evidence to sustain the conviction.

Prior to trial defendant filed Motion for the Suppression of Evidence alleging that

on October 18, or 19, 1966, at defendant's home, 809 Allen Street, St. Louis, Missouri, certain articles of merchandise were unreasonably, illegally, and unlawfully seized, and intended to be used against defendant; that the articles were taken by St. Louis police officers prior to issuance of an arrest warrant and under such circumstances that the police had no reasonable suspicion that any crime had been committed or that defendant had committed any crime; that the search, made without a warrant, was exploratory and not incident to lawful arrest; that the search and seizure were without warrant or any lawful authority and before the "unlawful" arrest of defendant and in violation of his constitutional rights; and that the articles so seized should be suppressed against use as evidence against defendant. An evidentiary hearing on this motion was held by a judge other than the trial judge after which the motion was overruled. The motion was submitted to the trial judge at the time of trial and was again overruled. Defendant also objected in trial to receipt in evidence of the items seized at his apartment and was overruled; and the motion to suppress, resubmitted at the close of the state's case, was still denied.

A view of the evidence adduced in this connection, favorable to the state and the court's ruling, supports the following statement.

On October 18–19, 1966, Officer Michael Johnson and Patrolman Wayne Keasling of the St. Louis Police Department were on duty together. At about 1:00 a. m., October 19, 1966, they were checking a car at 11th and Allen when Officer Johnson observed a truck which came out of Tenth and turned east on Allen and, later, a person running at about the intersection of Eighth and Allen. The policemen proceeded east on Allen in their patrol car. "At about Ninth Street, we saw two or three men * * * carrying boxes from a truck that was parked on the south side of Allen in the 800 block, and as we approached the men began running north towards an area-

way, at which time I stopped the car and jumped out and began to pursue them through this areaway which was at 809 Allen."

The areaway or gangway was shown to be an enclosed space leading from the front or south side of the building numbered 809 Allen Avenue to the north or alley side of the building. At the south or street side there was a door through which the passage was entered. The passage widened after entry and, at its north end, one could go into the alley or yard or turn sharply right, back to the south, and proceed up a wooden stairway to the second floor. There was an area or landing and two apartments at the top of the stairs. The door of one apartment, the south apartment, was immediately south across the landing. The other, the west apartment, had its door about four feet to the right of the stairs on the west side of the landing. There was a window to the right of each of the apartment doors opening onto the landing.

Officer Johnson lost sight of the two men he pursued in the gangway but heard footsteps, "it sounded like somebody running upstairs," and found wet footprints leading up the stairway. They led toward the west apartment where defendant ultimately was found. "It had been raining all night into the early morning, and at this time, there was a light drizzle falling." Officer Johnson walked upward one step and saw the two doors, each half glass and half wood, leading off the landing at the top of the stairs. By use of a miniature portable radio he then called for help and, within "a minute or two minutes," Lieutenant Kleine and Sergeant Long arrived. (Patrolman Keasling had pursued the third man fleeing from the truck west on Allen Street.) "After the lieutenant had arrived, I explained to him—I was still in the rear yard there keeping the stairway under surveillance—and I explained the facts, what had happened, to him. * * * Sergeant Long also joined us, the lieutenant and myself—walked towards Allen Avenue, to-

wards this areaway again. * * * As we were walking out, we found a large box laying in this areaway right next to the entrance. * * * it had a Carp's Department Store sticker on it, so we had knowledge that there was a Carp's Department Store in our district. Lieutenant Kleine knowing this requested the radio dispatcher to send a car by the Carp's Department Store in our district to ascertain if there was a burglary in that store. * * * We walked out to this truck I mentioned previous, this pickup truck, and we looked in the back and we saw four or five other boxes similar to the one that was found in the areaway, also bearing Carp's Department Store stickers. Now, it was raining this night, from the time we went to work until the time this occurred, and these boxes were not very wet, in fact most of them were still partially dry. Anyway, after we found these boxes and the box in the areaway, the lieutenant requested a car to go by to check the department store to see if it had been burglarized. About five minutes later the car called back and informed the radio dispatcher Carp's Department Store had been burglarized. * * * it was about 1:35 that we found out. * * * Myself, Lieutenant Kleine and Sergeant Long ascended the stairs at the rear of 809 Allen and we began knocking on the two doors, and we received no response. * * at this time there was a light in the middle room—there was no light but there was light coming from another part of the (west) apartment. * * * We heard movement in the apartment but we received no response to our knock. * * * we only heard movement in the west apartment. * * * Sergeant Long stationed himself on the second floor landing, there is a stairway leading to the third floor, what appeared to be an attic area. * * * myself and Lieutenant Kleine descended the stairs and went to the house in the rear * * * which we found to be vacant except for one apartment and we interviewed a man there as to who lived— * * * Lieutenant Kleine and myself then walked to the front of 809 Allen and

stationed ourselves against the building. * * * it was about 1:40 approximately. * * * After a period of about four or five minutes we heard Sergeant Long over the miniature radio put out a call for emergency, that he needed assistance, at which time myself and Lieutenant Kleine ran through the areaway and up the stairs, where we observed Sergeant Long struggling with a white female. Now, at this time he said, 'Andy Novak is in there, go in.' * * * So we observed that the glass had been broken * * * so Lieutenant Kleine tried to reach down to unlock the door. * * * he was unable to, at which time he instructed me—he said, 'Kick the door down.' * * * I kicked it open. * * * it opened into a room which was dark. * * * I shined my light around to make sure there was no one in there, * * * so I proceeded to the second room, which would be the middle room, which was also dark. I again shined my light around. I could hear movement coming from the third room, which would be the front room facing Allen Avenue. I identified myself as a police officer and told them to come out. * * *

"Q (By Mr. Mastorakos) When you went in the apartment then and saw the lady did you tell the people you were a police officer? A Yes, sir. Q Did you tell them what your purpose was for being there? A I said they were under arrest. * * *

"Q And did you find out that that was Andy Novak's home? A He said it, it was his apartment. * * *

"Q Officer, when you placed them under arrest did you tell them what they were under arrest for? A For burglary. Q What grounds were there, what facts or circumstance or what was in the apartment that led you to believe that they had committed a burglary? A In the middle room of the apartment we found three boxes similar to the one found in the areaway, also bearing Carp's stickers. * * *

"Q Did you discover these boxes that you say were in the apartment after you made the arrest, is that correct? A Yes, sir. Q You had already placed these people under arrest and then you searched the premises? A That's correct."

When Officer Johnson went into the apartment there were four people present, Andrew Novak, Thomas Maddox, Sharon Lyons, and Dorothy Dickson. Prior to entering the apartment he "knocked on the door many times stating we were police officers, that I was a police officer; heard movement inside, and we still got no answer."

Lieutenant Virgil Kleine was first called to assist in this case about 1:15 a. m., October 19, 1966, while patrolling in the area of Seventh and Geyer. He drove immediately to 809 Allen and conversed with Officer Johnson on the sidewalk there. It was raining at the time. Officer Johnson "pointed out some footprints that led back into the dry hallway, leaving an impression in the pavement, and they led northward to the hallway; then there was some footprints leading upstairs to the second floor premises." He noted the boxes on the truck and the one in the areaway bearing Carp's stickers and radioed for an investigation to see if a burglary had been committed at Carp's Department Store. He was advised by the dispatcher that an area car had determined there was burglary at Carp's.

"We went to a doorway leading to the * * * west apartment, where there was a light lit, * * * and we knocked on the door and also on the window. * * * After receiving no response, I then, along with Officer Johnson, went downstairs. * * * I noticed a light on in the rear building and I went back to that area, went up there and had a conversation with a man up there in that apartment. Q (Mr. Mastorakos) Did you ultimately enter the home of Andy Novak? A Yes, I did."

The door was opened by Officer Johnson kicking it open at the lieutenant's direction. The lieutenant had attempted to reach through the broken glass and open the door but was unable to do so. A stepladder had been propped against the door.

"Q (Mr. Mastorakos) Before Officer Johnson kicked the door down, did he tell the people to open the door, that they were officers? A Yes, sir. Q He specifically said * * * A Andy. Q Why did you call the name Andy? A Because * * * I had determined from my investigation that Andrew Novak lived in the premises. * * He was arrested immediately when the officers (Johnson and Long) entered the premises. * * * Before we found the merchandise * * *."

Prior to ordering the door broken, the lieutenant called out, "Police officer, * * Andy, open the door."

Lieutenant Kleine, a veteran of 26 years on the St. Louis police force, was acquainted with Andrew Novak prior to these circumstances.

Sergeant John Long responded to Officer Johnson's call to assist at 809 Allen. When he arrived Officer Johnson and Lieutenant Kleine were conferring about the middle of the gangway. He went to the second floor with them and "began to knock on the doors and windows." He heard "a noise that would indicate someone was moving about" in the west apartment. At this time he had knowledge through Lieutenant Kleine and over his miniature radio of the commission of the Carp's burglary. At the time of knocking, the lieutenant called out, "Police." When there was no response, Officer Johnson and Lieutenant Kleine departed and Sergeant Long stayed, "By the base of a staircase landing (or leading) up to the third floor." He waited there "motionless" for "approximately twelve, fifteen minutes. * * * I heard a man's cough— * * * then I heard a woman say— * * * I couldn't know what she was saying. * * * Then I heard some sort of moving about within the apartment premises, * * * I saw the curtain sort of move; shortly

thereafter, I heard the door starting to open, and when I was still waiting the female emerged out into the porch proper.

"Q (by Mr. Mastorakos) And then what happened * * *; was the door closed after the female stepped out? A No, sir. * * * Q How long was it left open? A Well, until I took the female into custody. * * * I would say a minute and a half, a minute, somewhere, the swiftness of it. * * * She stopped and attempted to return to the door she emerged from. Q Did you say anything to her? A I said, 'Police officer.' * * Q Did you pull your gun on her? A I had the pistol in my hand. * * *

"THE COURT: Did you see anybody? * * * Q Who did you see? A Andrew Novak. Q How did you see Andrew Novak? A Because I had approached this woman and as I am watching her I am looking towards the room there; at about this time the door was slammed in my face.

"Q Did you know Andy Novak? A Yes, sir, I know Andy Novak. * * * Q Did Mr. Novak do anything that was suspicious to you at this point? A He slammed the door rather violently * * * the glass broke. In the meantime I was struggling with this female to keep her in custody. * * * I got on the miniature radio * * * and radioed for assistance. * * * Lieutenant Kleine and Officer Johnson came to my aid on the porch."

Lieutenant Kleine attempted to open the door by reaching through the broken glass. That failing, he instructed Officer Johnson to break the door. Before Johnson broke the door Sergeant Long said, "Be careful Novak is in there." He and Johnson entered the first room where the door was broken. Q You arrested him (Novak) immediately when you went into the apartment? A Yes, sir, I saw him in the front room. * * * Q You advised him at that point—you advised him * * * he was under arrest; then did you look around the apartment? A Yes, sir.

"Q What did you see in the apartment after you arrested him? A Numerous articles of clothing which were bundled and numerous cartons and all types of clothing which was packaged up. * * * Q It was after you made the arrest that you made the identification (of Carp's merchandise), * * *? A Yes, sir."

Patrolman Ralph Collins went to Carp's Department Store at Manchester and Tower Grove, at approximately 1:25 a. m., October 19, 1966, in response to radio direction. He observed a rear door partially opened and clothing strewn about the inside. He returned to his scout car and by radio advised that a burglary had been committed.

Bill King, manager of Carp's Department Store at Tower Grove and Manchester on October 18, 1966, packed a number of cartons of merchandise for shipment to other stores. The boxes were marked with a Carp label and placed at the rear door. The building was closed and locked at 5:30 p. m. that date. Between 1:30 and 1:45 a. m., October 19, 1966, he was called by police to return to his store and found the broken rear door and that the boxed merchandise was missing as well as some cash. Around 2:30 to 2:45 a. m., October 19, 1966, he went to 809 Allen and identified part of the merchandise and boxes there in Andrew Novak's apartment, in the gangway, and on the truck as that he had packaged the day before.

The merchandise so identified was seized and, over defendant's objection, received in evidence against him. There were no arrest or search warrants issued.

Appellant contends the court erred in rulings on his motion to suppress and objections to evidence because: (I) "The police officers' forced entry into appellant's apartment was made without probable cause to arrest (appellant) * * * and constituted an unreasonable search and seizure * * *." (II) "Even if the officers had probable cause to believe a felony had been committed and that the person or

persons responsible were within appellant's apartment the officers' forceable entry was unreasonable under all the facts and circumstances present and was in violation of appellant's rights under the IV and XIV Amendments of the Constitution of the United States and Article I, Sections 15 and 19 of the Missouri Constitution."

■ The legal principles dispositive of appellant's first contention are not in dispute. For the evidence at issue to have been admissible, it had to be the product of a search incident to lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause. Ker v. State of California, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 10 L.Ed.2d 726.

■■ "It is well settled that 'Police officers may arrest without a warrant if they have reasonable cause to believe that the person arrested is guilty of a recent felony,'" State v. Johnson, Mo., 420 S.W.2d 305, 308[2], and police officers of the City of St. Louis possess such authority. State v. Edmonson, Mo., 371 S.W.2d 273, 276[4].

■■ Dealing with probable cause for arrest requires dealing with probabilities which are not technical but "are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. * * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed," Brinegar v. United States, 338 U.S. 160, 175–176[4], 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, and "The substance of all the definitions (of probable cause) is a reasonable ground for belief of guilt," Carroll v. United States, 267 U. S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543.

■ The previous statement of this case demonstrates the existence of probable cause within the meaning of the foregoing principles warranting the arrest without warrant of Andrew Novak and the subsequent search of, and seizure in, his premises. Those "facts and circumstances" showed the court the suspicious behavior of several persons unloading boxes from a pickup truck which arrived at 809 Allen Avenue in St. Louis at 1:00 A. M. The flight of those persons upon approach of the police car added to that suspicious circumstance. Officer Johnson gave immediate chase through the gangway leading to the stairway to the Novak apartment. Although he lost sight of the fleeing persons, wet footprints and the noise of footsteps on the stairway warranted an inference that those persons went into one of the apartments at the top of the stairs and Novak's apartment, alone, showed a light and contained "movements" during the period of surveillance. Cartons of merchandise bearing a Carp's Department Store label were found on the pickup truck and in the gangway. Burglary of Carp's Department Store earlier that night was verified through official police channels and, through investigation at the scene, the police became advised that Andrew Novak, priorly known to at least two of the officers (Brinegar v. United States, supra, 338 U.S. l.c. 172–174, 69 S.Ct. 1302), lived in the apartment ultimately entered and searched. After verification of the burglary and learning of the owner of the apartment, the officers knocked on the door and identified themselves as police. When there was no response, one officer was left to keep the apartment under surveillance and within a few minutes a woman emerged furtively. While the door was thus open, the officer saw Andrew Novak inside and he slammed the door shut with sufficient force to break the glass. All the officers then returned to the door and, upon refusal of their request to open the door, the door was broken and Andrew Novak, with others, was, under such circumstances, lawfully arrested inside.

■ "It is further well settled that when a person has been lawfully arrested, a search without a warrant may be made of the person and of the premises where he was arrested." State v. Jefferson, Mo., 391 S.W.2d 885, 888[2]; Ker v. State of California, supra.

■ The previous statement also demonstrates evidence that the search of Andrew Novak's premises and the seizure of cartons of merchandise marked with Carp's label took place after the arrest of Andrew Novak. Since the arrest was a product of probable cause and therefore lawful, the subsequent search was incident to the arrest and, under the authorities, it, too, was lawful. Under these circumstances this was not a case in which the government was "obliged to justify the arrest by the search and at the same time to justify the search by the arrest," e. g., Johnson v. United States, 333 U.S. 10, 16[5], 68 S.Ct. 367, 370, 92 L.Ed. 436, where the government conceded a lack of probable cause and attempted to justify the arrest of defendant as the sole occupant of the place entered which knowledge they gained only after entry; nor was this the doubtful case where convincing evidence of an immediate need to search was lacking thus requiring a warrant upon the decision of a judicial officer as described in Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 4 L.Ed.2d 697. See also Aguilar v. State of Texas, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723.

Appellant argues the mere fact that a woman came out of the apartment with a subsequent slamming of the door is of no consequence because the slamming "was an ambiguous act. It could have been merely the expected reaction of any citizen having this experience at that hour of the morning." Miller v. United States, 357 U.S. 301, 311, 78 S.Ct. 1190, 1196, 2 L.Ed.2d 1332. This argument might have some merit if the woman's exit and subsequent door slamming were the only suspicious circumstances, but here they are but two of many related facts and circumstances supporting a finding of probable cause.

Appellant's second contention is that even if the necessary probable cause for arrest without a warrant was shown, the entry into the apartment by force and the subsequent search without a search warrant were still unreasonable.

■ An officer may break open any outer or inner door or window of a dwelling house in order to make an arrest if, after notice of his office and purpose, he be refused admittance, Section 544.200, V. A.M.S., Miller v. United States, supra, 357 U.S. l.c. 307–310, 78 S.Ct. 1190; Ker v. State of California, supra, 374 U.S. l.c. 37–38, 83 S.Ct. 1623; and in determining the propriety of search without a warrant, "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case." United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653. To justify entry of a dwelling without warrant there must be "exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." Johnson v. United States, supra, 333 U.S. l.c. 14–15, 68 S.Ct. l.c. 369. See also Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449; Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660; and Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456.

■ It already has been demonstrated that the officers had probable cause upon which to base their arrest of Andrew Novak without a warrant. In addition, the statement contains evidence that the officers complied with the statute by knocking on appellant's door several times requesting admittance but were still refused. This, coupled with the evidence bearing on probable cause for arrest and, particularly, the

slamming of the door upon the woman's exit, her arrest, the knowledge that Andrew Novak was the owner of and in the apartment, and the likelihood that he saw the officer, made the entry by force and subsequent arrest reasonable.

Having held the arrest of Andrew Novak lawful and the search lawful in so far as it was an incident of lawful arrest, it remains only to consider whether the search was unreasonable on the ground it exceeded the recognized bounds of an incidental search.

Appellant's argument is that the search was not reasonable because the fleeing subjects were no longer fleeing but were penned up in the apartment and could be kept there by one officer indefinitely while another presented himself and the evidence before a magistrate for a search warrant, even though a magistrate might not be available until working hours. He also argues that there is no question of disposing of evidence, an argument which overlooks the opportunity of appellant and the other occupants to remove the Carp labels from the boxed merchandise and commingle it with other merchandise in the apartment and thereby destroy its identify as Carp's property and the fruits of a specific burglary. Even without this latter circumstance, "the practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest." Ker v. State of California, supra, 374 U.S. l.c. 41, 42, 83 S.Ct. l.c. 1634, and "It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant." United States v. Rabinowitz, supra, 339 U.S. l.c. 65, 70 S.Ct. l.c. 435.

In circumstances such as these, officers should not be expected to run the risk that the arrested person may have a weapon which he might use. In addition, as in this case, the arrested person may have the fruits of his crime about him, and

the only way to guard against weapons or against destructions of fruits of the crime is for the arresting officers to make prompt search of the person arrested and the area immediately surrounding him. The evidence in this case contains the "necessitous haste" or exceptional circumstances to warrant exception to the basic principle that a warrant to search must always be procured. United States v. Rabinowitz, supra.

Matters of record for examination under Criminal Rules 28.02 and 28.08, V.A.M.R., are free of error.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court
All concur.