**STATE of Missouri, Respondent,**

v.

**Albert Lowe HAMMONDS, Appellant.**

No. 55243.

Supreme Court of Missouri,
Division No. 2.

Nov. 9, 1970.

**366** ■ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Alfred I. Harris, St. Louis, for appellant.

PRITCHARD, Commissioner.

Upon its finding of appellant's guilt of second degree murder, the jury was unable to assess the punishment. The court assessed the punishment at seventeen years confinement in the Department of Corrections. Appellant contends (by Point VI) that the state failed to make a submissible case against him.

There was a party at 4136 Clarence in the City of St. Louis on the evening of December 1, 1967, during which the shooting occurred for which appellant was charged. The version of the incident of Bobbie Jean Taylor was that Rose Wallace, sister of the deceased, and another girl came and picked her up for the party. They all sat around and talked until after one o'clock when Bobbie Jean went to the kitchen to get something to eat. She then heard shots and saw flashings down the hall. She went down the hall and saw Sonny (the deceased, James Wallace) lying on the floor, with Irene McConnell and a man called Yacko (appellant) standing over Sonny in the door of the bedroom. Bobbie Jean did not see a gun, and did not see appellant fire a gun.

Irene McConnell came to the party with Rose Wallace, arriving about nine or ten o'clock. Appellant, whom Irene had dated, was there. Irene had also gone out with or had been a friend of James Wallace. While Irene was in the kitchen, appellant came in and asked her to go up front where they had been dancing earlier. She first declined, but then agreed to go into another room down the hallway into which he pushed her. She grabbed him by the collar and pushed him up against the wall after which she made her way to the hallway. Appellant was then in the doorway area and Irene heard shots and saw at least two sparks coming from appellant's hand, the sparks being "Something like when you pop a firecracker at night and it sparks." Prior to the altercation and while dancing with appellant Irene felt a gun as she had her arm around his

waist. She asked him what he was doing with it but he did not answer. After the shots were fired Irene left with appellant and went to his sister's apartment where appellant took the gun, removed some bullets from it and laid it on the table. The gun appellant had resembled State's Exhibit 1, but Irene was not able to say whether any of the bullets had been expended.

Abe Wallace, the deceased's brother, was at the Clarence Avenue party, but had gone to the street when he heard shots. He started to return to the home and met Irene and appellant coming out. Appellant was behind Irene and was shoving her. Appellant was wearing a trench coat and his one hand was in it making the pocket bulge. Abe then went upstairs and saw his brother lying on the floor bleeding from the neck. He was carried to a bed where Abe saw that he had also been shot in the leg.

After investigating the shooting, Detective Carl Hunt put out a teletype message requesting appellant's arrest, under the name of "Yacko." Thereafter Detective Ray Lauer was on duty December 2, 1967 at 8:55 p. m., when appellant came to the police station and stated he had been involved earlier in the day in a disturbance with a man. Appellant acknowledged that he was known by the name of Yacko. Appellant was informed of his constitutional rights and was then taken to City Hospital No. 2 where the victim, James Wallace, was confined. Wallace was asked, " 'Can you recognize this man?' And he says, 'Yes, that is Yacko.' And we asked the victim, 'Do you know this man?' And he said, 'Yes, sir. That is the man that shot me.' " Appellant declined to make a statement in the presence of the victim, and upon being later booked on a charge of assault with intent to kill declined to assist in locating the weapon.

On March 6, 1968, Patrolman Paul Rea was on duty in a squad car with Patrolman Michael Driscoll. About six o'clock, while driving up Cass Avenue near the Pruitt Igoe parking lot, Driscoll pointed out a red and white 1966 Chevrolet Caprice automobile and said that the man by the name of Yacko who had been driving it was wanted by the police department. At the time the automobile was unoccupied, but the two officers saw it parked later at Shorty's Dugout. They took up surveillance and about 11:05 saw a Negro male enter the automobile and drive north on 25th Street. The officers stopped the car on Madison and found appellant alone therein, and Driscoll retrieved the gun. Outside the hearing of the jury, the court took up appellant's oral motion to suppress the evidence of the gun, the timeliness of the motion being waived by the state. These facts were then developed: Rea, with Patrolman Driscoll, without a warrant, arrested appellant on March 6, 1968, "For flourishing a dangerous and deadly weapon and discharging firearms in the City Limits." They stopped appellant because they understood he was wanted for discharging firearms. Rea did not know appellant had been arrested previously on December 2, 1967 for an assault. The incident for which appellant was arrested occurred February 20, 1968, and the officers knew he was wanted for that offense.

Rea's testimony resumed in the presence of the jury. At the time they drove to the rear of appellant's automobile, he saw appellant lean forward as if placing something under the front seat. Driscoll stepped out of the police car and appellant was already walking back toward it. They took appellant's driver's license and he identified himself as Albert Hammonds. Appellant was then informed that he was under arrest and Driscoll went to the automobile and retrieved a two-inch snub-nosed loaded revolver, State's Exhibit 1, in a brown holster. Six other rounds of ammunition were found in appellant's watch pocket. Driscoll's version of the arrest was similar to Rea's, and he saw appellant lean forward, "dipping his right shoulder

as if to place something under the seat of the automobile." Driscoll advised appellant of his rights when he arrested him, then searched him and his automobile and recovered the revolver and holster from under the left front seat of his automobile. He took the revolver, and the holster and marked them with his initials, along with twelve bullets in an evidence bag.

Firearms Examiner Joseph Brasser took a bullet he had received from Dr. Criscione and compared it with a test shot from the gun (State's Exhibit 1), and found that "this bullet was definitely fired from this gun."

Deceased's sister, Rose Wallace Rach, for whom appellant was giving the party on December 1st and 2nd, was present thereat and was greeting guests. She had worked for appellant in his confectionery since November, 1967, and saw him with a gun similar to State's Exhibit 1 three days after she started working. She saw appellant dancing with Irene who was engaged to deceased. Later, as Rose was dancing, she heard shots and saw flashes, went to her brother and found he had been shot.

Dr. James Criscione did an autopsy on deceased, and removed a pellet from the left side of the neck. Another pellet was found in the left leg but was not removed. The pellet was placed in a box by him and was given to an officer at the morgue. It was his opinion that deceased died of pneumonia caused by the gunshot in the neck. According to a statement by counsel for the state deceased died eleven days after the shooting.

Appellant's version of the shooting was that after he and Irene were dancing they went to tell Rose they were going together, and as he was hugging Irene deceased came out of the front room, "him and a bunch of guys with him." Deceased came over to appellant and asked him what the hell he was doing, jerked him out of the doorway and tore his coat. Appellant stop-

ped and looked at deceased who stepped back and went to his pocket. "He went for gun I went for mine." Appellant turned himself in to the police later. The gun that did the killing (State's Exhibit 1) looked to him as identical to the one he had which he was carrying when he arrived at the party December 1, 1967.

■ In attacking the sufficiency of the state's case appellant says, "While there is direct evidence that defendant did in fact discharge the weapon that inflicted the fatal wound upon deceased, there was not direct evidence of the requisite mens rea: wilfully, premeditatedly, and with malice aforethought." The testimony of the witnesses who heard the shots and saw the flashes, and appellant's admission that he did shoot deceased, establishes that he did so intentionally. Under the facts and circumstances which were for the jury to evaluate, there was a presumption raised that appellant intended death when he fired the revolver. "The jury, and the witness who observe the criminal act, can only judge what is in the mind of the perpetrator by the act itself. The intent necessarily prompts the conscious act and must be presumed. Hence it is universally held that every one is presumed to intend the natural and probable consequences of his own intentional act. [Citations] It follows that where one uses a weapon likely to produce death in making an assault upon another, and death ensues, the one who commits the act is presumed to intend death. [Citations]" State v. Hart, 309 Mo. 77, 274 S.W. 385, 387 [3, 4]. See also State v. Gaters, Mo., 39 S.W.2d 548, and State v. Richardson, Mo., 321 S.W.2d 423. The necessary malice may be presumed also from the intentional killing with a deadly weapon. State v. Mitchell, Mo., 408 S.W. 2d 39, 42 [1–5]. The premeditation to do the act need exist only for a moment. State v. Robinson, 73 Mo. 306. The matter of self-defense, which appellant's testimony tended to establish, was for the jury to determine as submitted to it in Instruction No. 3. State v. McQueen, Mo., 399 S.W.

2d 3, 6 [5, 6]. Appellant's contention that the state failed to make a case of murder in the second degree is overruled.

■ Appellant's Points I, IV and V relate to claimed erroneous admission of evidence. The matters were not contained in the motion for new trial and hence are not preserved for review, and the same are not presented as plain error under Supreme Court Rule 27.20(c), V.A.M.R. Hence, these points will not be considered. State v. Tellis, Mo., 310 S.W.2d 862, 865 [7, 8].

■ Point III is that it was error to admit into evidence the gun and pellets "as no continuous and coherent chain of physical possession and control of the same was proven by the State." The record shows that these items were received into evidence on one day of the trial and no objection thereto was made until the next day. The objection came too late, and the trial court will not be charged with error for overruling it. Besides, the record shows the items were sufficiently marked, identified, and the chain of possession thereof was sufficiently shown. Appellant himself testified that the gun was identical to the one he had. Point III is overruled.

■ Point II relates to the trial court's overruling of appellant's oral motion to suppress evidence of the gun based upon the lawfulness of the arrest and the attendant search of appellant's automobile and the seizure of the gun therefrom. Although not preserved for review in the motion for new trial, the matter relates to a constitutional right and will therefore be considered under the plain error rule, supra. State v. Coyne, Mo., 452 S.W.2d 227, 228 [1]. The question first relates to whether officers Rea and Driscoll had probable cause to stop appellant in his automobile and arrest him on March 6, 1968. These two officers knew that appellant was wanted by the Police Department for flourishing a deadly weapon, an offense unrelated to the present charge, and which occurred on February 20, 1968. They knew appellant's automobile, put it under surveillance, and when he entered it and drove away they followed him. As they stopped him, they observed him lean forward in his automobile as if to place something under the seat. The arrest was effected for the offense of exhibiting and discharging a firearm, a deadly weapon, about two weeks before. Police officers may arrest without a warrant if they have reasonable cause to believe that the person arrested is guilty of a recent felony. State v. Novak, Mo., 428 S.W.2d 585; State v. Caffey, Mo., 436 S.W.2d 1; State v. Murray, Mo., 445 S.W.2d 296; and State v. Goodman, Mo., 449 S.W.2d 656. The facts here go beyond a mere suspicion of guilt, and under all the circumstances the arrest was based upon probable cause and was lawful. And, as incident to a lawful arrest, a reasonable search of the person and the automobile may be made without a search warrant. State v. Novak, supra; State v. Hamblin, Mo., 448 S.W.2d 603. Inasmuch as appellant was wanted for a firearm offense, the officers were entitled to search him and his automobile to procure the weapon used in the offense for which he was wanted, having probable cause to believe that it contained that article. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, 426 and the therein cited case of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, distinguish circumstances justifying a warrantless search of an automobile and a home. The facts and circumstances here, considered together, demonstrate that the trial court did not err in overruling appellant's motion to suppress the evidence.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD. C., is adopted as the opinion of the Court All of the Judges concur.