**STATE of Missouri, Respondent,**

**v.**

**Donald Gene VINEYARD, Appellant.**

**No. 9221.**

Missouri Court of Appeals,
Springfield District.

July 23, 1973.

Motion for Rehearing or to Transfer to
Supreme Court.

Denied Aug. 6, 1973.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar Special Asst. Atty. Gen., St. Louis, for respondent.

Harold F. Glass, Springfield, James C. Snapp, Pleasant Hope, for appellant.

TITUS, Chief Judge.

Defendant was charged and convicted by a jury of burglary in the second degree (§ 560.070 RSMo 1969) and stealing. § 560.-156 RSMo 1969. Having also been tried under § 556.280 RSMo 1969 (Second Offender Act), the trial court imposed concurrent sentences of five years for stealing (§ 560.110 RSMo 1969) and ten years for second degree burglary. § 560.095(2) RSMo 1969. Defendant appeals.

On January 13, 1971, Joy Beaver was the renter-occupant of a house numbered 433 W. Portland, Springfield, Missouri. The southward facing house, situate on the north side of east-west Portland, consisted of two west bedrooms, a living room and kitchen in the middle, and a garage and utility room on the east. A driveway ran north from Portland into the garage which had at least one east window located seven feet six inches from the west wall of the next door abode occupied by the Thompsons. A bedroom with a west window was in the southwest corner of the Thompson residence allowing a person standing in that room visual entrance into the Beaver garage through its east window.

Near 9 p. m. on the day in question the Thompsons, preparing to retire, heard a noise and looked from their southwest bedroom to sate the curiosity aroused by the din. They observed an unlighted green Buick bearing several males being backed toward the open unilluminated Beaver garage. Upon extinguishing the bedroom light, the Thompsons saw that the Beaver garage lights "went on" but momentarily "went off" while a city bus passed by the houses. The Thompsons saw six men "all told" in the Beaver garage "but part of the time there were only four." These men were observed by the Thompsons to "go toward the front of the garage, pick up something, [then] go to the back of the garage and come back toward the front, as if they [were] carrying something with some weight. And then after awhile we saw a bag, shaking out bags, plastic bags. . . . Well, it looked as if it might be shirts or blouses [in the bags]. They were folded up, done up, it looked like, in individual plastic containers."

After observing these next door activities for some time, Mr. Thompson telephoned the Springfield Police Department at 9:45 p. m. to report his sightings. Via radio, the police dispatcher sent four police cars to the Beaver residence admonishing the officers that "a possible house burglary [was] in progress" and that several subjects were involved. The first arrival at the Beaver residence was Officer Woods who was quickly joined by Patrolman Brinkman and his police canine, Major. Woods, standing east of the Beaver garage, told Brinkman to go to the front while he covered the rear. As Brinkman and Major were passing the garage window, Brinkman looked inside and saw one Morelock, a known convicted felon, "sacking up some type of articles" in the garage. Prior to seeing Morelock in the garage, Brinkman knew that Morelock had claimed the Pioneer Hotel as his residence; Brinkman had also previously seen Morelock riding in the green Buick that was parked in the Beaver driveway.

By the time Patrolman Brinkman and Major reached the front door of the Beaver residence, other policemen had arrived on the scene. Looking through the front door glass, Brinkman espied Morelock coming from the kitchen into the front room. Apparently Morelock saw the patrolman at about the same time because he turned back towards the kitchen. Without knocking or otherwise announcing himself, Brinkman opened the unlocked front door, "entered the house and hollered at Morelock to stop and come back here, he was under investigation for burglary and larceny." Morelock complied and was turned over to other policemen who had followed Brinkman and Major into the house. Brinkman then went into the kitchen and utility room in search of the other reported subjects. As he stepped into the utility room he "observed shirts stacked up in the garage, through an open door from the utility room through to the garage." Defendant Vineyard was discovered by Brinkman hiding in the utility room. "He

was crouched down underneath [a] box lid. I took the box lid off and placed him under arrest."

Patrolman Larbey, also summoned to the scene, passed by the Beaver garage window and saw Morelock and defendant Vineyard in the garage. Larbey knew Morelock and Vineyard by sight and had been Vineyard's jailer two nights before when the defendant represented that he lived at "400 something South Golden." After entering the house, Larbey started for the garage but was met by Officers Brinkman, Dishman and Foster with the defendant and Morelock in tow. Because more subjects were reported in the house, Larbey continued searching and found George Miller "lying down behind the couch" in the living room. Officers Dishman and Crocker inspected the bedrooms "searching for the others" and found Bobby Joe Ross "crouched down with some clothes throwed over him in the corner of the closet . . . making himself very small."

After defendant Vineyard and the others found at the Beaver residence had been removed from the house, the officers inspected the shirts they had seen in the garage while searching for the reported subjects. They discovered "approximately 1,400 shirts." Some were in plastic bags the others loose; they were labeled with the name "Dillard's Brown-Duncan." Later investigation that night revealed that Dillard's warehouse in Springfield had been broken into and the shirts in question stolen therefrom. It had rained on January 13, 1971, and mud had been tracked into the warehouse. Samples of the mud inside and outside of the warehouse were obtained by the police; defendant's muddy shoes were taken from him and delivered, together with the mud samples, to the "Highway Patrol Crime Laboratory" for analysis.

When the officers entered the Beaver residence they had no arrest warrant and no search warrant and knew nothing of the burglary and stealing at Dillard's ware-

house for which defendant was tried and convicted.

## I

Defendant's first point relied on is that the trial court erred in overruling his motion to suppress and in admitting into evidence the stolen shirts, mud samples, defendant's shoes, photographs of the Beaver residence and of the warehouse because "said items were taken and obtained pursuant to and by an unlawful search and seizure and an unlawful arrest." Contrary to the requirements of Rule 84.04(d), V.A.M. R., applicable in criminal cases per Rule 28.18 [State v. Orr, 493 S.W.2d 374, 376 (Mo.App.1973)], we are not advised "why" it is claimed the arrest, search and seizure were allegedly unlawful. Nevertheless, our gratuitous search of the argument portion of the defendant's brief indicates, in substance, that the averred search was improper and it was not made pursuant to a lawful arrest because the arrest was predicated on information obtained from an informer of unknown reliability, and because there was, in fact, no burglary of the Beaver residence and hence no reasonable grounds for the officers to believe that there was a burglary and larceny of the house in progress or that such crimes had been committed.

Legal principles dispositive of defendant's first point are not disputed. The evidence in issue to be admissible must be the product of a lawful arrest in the absence of a search warrant, and, in turn, the lawfulness of the arrest sans a warrant, is to be based and tested upon probable cause. State v. Novak, 428 S.W.2d 585, 591[2, 3] (Mo.1968). Police officers may arrest without a warrant if reasonable cause exists for them to believe that the person arrested is guilty of a recent felony [State v. Hammonds, 459 S.W.2d 365, 369 (Mo. 1970); State v. Johnson, 420 S.W.2d 305, 308[2] (Mo.1967)], and "Dealing with probable cause for arrest requires dealing with probabilities which are not technical but 'are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. * * * Probable cause exists where "the facts and circumstances within . . . [the officers'] knowledge and of which they have reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed,' Brinegar v. United States, 338 U.S. 160, 175–176[4], 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, and 'The substance of all the definitions (of probable cause) is a reasonable ground for belief of guilt,' Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543." State v. Novak, supra, 428 S.W.2d at 591[6, 7].

Defendant's claim that the arrest was based on information obtained from an informer of unknown reliability is untenable for a variety of reasons, the first being that the so-called informant's information was not all the pre-arrest information the officers relied on and the second being that "[i]n the absence of exceptional circumstances not present in this case an informant who states that he is an eyewitness to the commission of an actual crime may be reasonably deemed by an officer to be reliable." Smith v. Swenson, 328 F. Supp. 747, 752[7] (W.D.Mo.1971). Since that information was reliable it did not lose its reliability when it was transmitted via radio [State v. Ward, 457 S.W.2d 701, 706 (Mo.1970)] by the police dispatcher receiving it to the police officers who effected the arrest. " ' . . . [W]here reliable information is originally imparted to the police, the fact that such information does not come directly from the informant to the arresting officer does not prevent the latter from relying on its trustworthiness when it reaches him through official channels.' People v. Gardner, supra, [252 Cal.App.2d 320] 60 Cal.Rptr. [321] at 324–325[7, 8]." State v. Whorton, 487 S. W.2d 865, 867 (Mo.1972).

■ We experience no difficulty in upholding the determination by the court nisi that the police officers had probable cause to arrest the defendant; the totality of the facts and circumstances is clearly supportive. The trial court was entitled to and did credit the testimony of the officers. Thus, we have: (1) the officer's knowledge of reliable information from an eyewitness that several subjects were gathered at 433 W. Portland engaged in a possible burglary; (2) a green Buick, in plain view, backed into the Beaver driveway, which was recognized by the officers as a means of transportation for known burglars; (3) the knowledge obtained by officers Brinkman and Larbey by looking into the garage that two known felons were inside; (4) the prior knowledge of these officers that Morelock and Vineyard, who were seen inside the garage, had represented that they resided at places other than 433 W. Portland; (5) the observations by Brinkman of Morelock, a known felon, occupied in "sacking up some type of articles" in plastic bags inside the garage; and (6) Morelock's movement away from the living room when he apparently realized he had been seen through the front door window by Brinkman. Bearing in mind that "probable cause is a practical, nontechnical conception" [Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964)], the foregoing elements all available to the officers at the moment of arrest [State v. Kelley, 473 S.W.2d 707, 710[3] (Mo. 1971)], in our view comprise probable cause for arrest and are far above the level of a mere suspicion that a felony was being committed and that defendant, with others, was engaged in committing it. Cf. United States v. Stead, 422 F.2d 183, 184[1] (8th Cir. 1970), cert. denied 397 U. S. 1080, 90 S.Ct. 1534, 25 L.Ed.2d 816 (1970), 398 U.S. 966, 90 S.Ct. 2181, 26 L. Ed.2d 551 (1970).

■ Defendant emphasizes that at the time of the arrest none of the officers had any knowledge of Dillard's warehouse burglary and that he and the others were arrested for burglarizing the Beaver residence but not tried on that offense. The fact defendant was arrested for an offense other than that for which he was later tried is immaterial [Jackson v. United States, 408 F.2d 1165, 1171[8] (8th Cir. 1969)] and a lawful search is not invalidated because it reveals an additional and different offense. Gullett v. United States, 387 F.2d 307, 310[6] (8th Cir. 1967). Defendant further suggests that the officers had no right to enter upon the property. But even if a technical trespass had occurred, it would not make the subsequent arrest or search unlawful if they were otherwise reasonable. United States v. Young, 322 F.2d 443, 445[5, 6] (4th Cir. 1963). Moreover, the officers had a right to proceed onto the property as they had probable cause to believe they were observing a felony being committed in their presence. United States v. Taylor, 428 F.2d 515, 520 (8th Cir. 1970).

■ As we view this case, the stolen shirts were not discovered as the result of any search whatsoever. The officers upon entering the house were not looking for things but for persons. They had received reliable information that several subjects were in the house and had seen two of them in the garage before entering. Therefore, upon encountering only one subject upon immediate entry, the officers had a right to conduct a search of the premises to ascertain the location of the other reported subjects who could present a security risk, interfere with the arrest of Morelock, or escape. United States v. Briddle, 436 F.2d 4, 7 (8th Cir. 1970), cert. denied 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 24 (1971). Discovery of the shirts was simply incidental to the search of the house for the reported subjects; the stolen shirts fell within the plain view of the officers while that search was being conducted. ". . . [O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States, 390 U.S. 234, 236,

88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); State v. Reask, 409 S.W.2d 76, 83[6] (Mo. 1966). Of course, defendant's shoes would fall within the plain view of the officer when he was arrested, and the picture of the Beaver residence showed no more than any private citizen could easily observe from the public street.

Although our Supreme Court opines all former distinctions between premises owners, licensees, invitees and guests have been eliminated in determining standing to object to searches and seizures, and that the issue of standing must be approached "on a case by case basis, examining the facts in each case to determine the relationship of defendant to the premises and property and to determine whether defendant was entitled to and did have a reasonable expectation that the property would be free from governmental intrusion other than by a proper and lawful search and seizure" [In re J.R.M., 487 S.W.2d 502, 505 and 508[2] (Mo. banc 1972)], we fail to see how defendant has any standing to object to the mud samples taken from Dillard's warehouse or property. The samples were not obtained from premises wherein defendant claims any possessory right as an owner, lessee, licensee, invitee or guest; neither could the Dillard property be lawfully claimed by defendant to be his, temporarily or otherwise, free from governmental or other intrusion.

## II

Defendant's second point is that the trial court, after granting the motion for severance, erred in admitting evidence that others were involved "because such evidence was irrelevant, immaterial and highly prejudicial." To this point defendant cites State v. Pitchford, 324 S.W.2d 684 (Mo.1959) and State v. Cavener, 356 Mo. 602, 202 S.W.2d 869 (1947), neither of which, in our opinion, is remotely apropos. The evidence established that defendant and the others were acting together in the commission of the burglary of Dillard's

warehouse and were arrested in the possession of a large quantity of shirts stolen from the warehouse. In such an event the acts of any of them done in the furtherance of the burglary and stealing could be shown. State v. Aguilar, 478 S.W.2d 351, 355–356[12] (Mo.1972). In addition, because of defendant's continuing objections to the evidence (a repetition of the objections made in his motion to suppress), it was incumbent upon the State during the trial to show that the officers had probable cause to arrest the defendant. As probable cause was dependent upon the totality of the facts and circumstances known and existing at the time of the arrests, evidence that others were involved was proper in this case.

## III

The third point relied on: "The trial court erred in failing to make proper inquiry of the jurors as to the two newspaper articles published during the trial and erred in failing to adequately determine the prejudicial effect of said articles." This alludes to an incident occurring on the morning of the second day of trial when defendant's counsel, out of the presence of the jury, introduced into evidence an item appearing in the previous evening newspaper and an item appearing in that morning's edition of the newspaper. The items referred to defendant's past criminal record of convictions and arrests and other matters which we assume arguendo would have been prejudicial to defendant's right to a fair trial had they, in fact, come to the attention of the jury. Defendant moved for a mistrial and, in the alternative should a mistrial not be declared, "that perhaps they should be further instructed or some instruction given to them, particularly to any of those who might have seen the article." To this the court replied: "Here is what I propose to do: . . . I think we will have the jury come in then I will voir dire them about having read any articles. If they have then I will have to arrive at a conclusion, depending upon interrogation. You will have the privilege

of objecting to the juror or jurors who say that they did see something in the paper, and we will do that outside the hearing of the other jurors."

■ After the jurors resumed their places in the box, the trial judge spoke: "Ladies and gentlemen of the jury, you will recall last night I cautioned you about attempting to read anything about this case in the newspapers. I must ask you at this time, did any of you read last night's newspaper article or this morning's newspaper article about this trial? Did any of you?" There was no response and the court inquired: "Did anybody attempt to tell you what was in those articles?" Again there was no response from the jury, whereupon the court concluded: "All right, thank you so much." Defendant did not object to this manner of interrogation; neither did he request that the jury be required to answer audibly nor ask that the jurors be questioned individually out of presence of the other jurors.

■ Objections anent the jury in criminal cases come too late for appellate review when made for the first time in the motion for new trial [State v. Robinson, 484 S.W.2d 186, 188 (Mo.1972); State v. Childers, 268 S.W.2d 858, 860[2] (Mo. 1954)], and the same is true regarding defendant's present objections to the manner of the trial court's interrogation of the jurors relative to the newspaper articles. If defendant wanted the jury to answer audibly, although the lack of any response indicated a unanimous negative reply to the court's questions, or if the defendant wanted the jurors examined separately, in the absence of unusual circumstances not shown here, motions for such measures should have been timely made by defendant —the court was not required to proceed sua sponte as defendant now suggests. Margoles v. United States, 407 F.2d 727, 731–732[5, 6] (7th Cir. 1969), cert. denied 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). "But, in any event, the trial court did question the jurors collectively about these newspaper articles . . . .. Since none of the jurors responded affirmatively, the trial court was not required to [interrogate] the jurors individually." State v. Howard, 449 S.W.2d 662, 663[2] (Mo. 1970).

## IV and V

We consider together points IV and V wherein defendant urges that the trial court erred in permitting Michael Brizendine to give his opinion regarding the mud samples because "said witness was not properly qualified as an expert" and because "no proper foundation was laid for his opinion testimony," and erred in admitting into evidence a photograph of part of the testing made of the mud samples because the picture "was merely surplusage and cumulative evidence; it exaggerated the results of the mud sample tests; and it was calculated to arouse the prejudice of the jury."

■ "The qualification of an expert and the question of whether expert opinion upon the subject matter should be permitted are questions which ordinarily should be determined by the trial court in the exercise of a sound discretion. The action of the trial court in admitting expert testimony . . . is reviewable on appeal on the issue of abuse of discretion and the trial court should not be reversed unless the error, if any there is, is shown to be prejudicial." State v. Barker, 490 S.W.2d 263, 273[14–15] (Mo.App.1973).

Mr. Brizendine, a "lab technician for the Missouri Highway Patrol" with the duty of "analyzing scientific evidence," was called as a witness by the State concerning testing he had performed on the various mud samples with which he had been furnished. The witness stated he had "a bachelor of science degree in biology . . . with a minor in geology," that he had been employed by the patrol "about 16 months," that he "had between five and ten cases" where he compared soil samples, and that it was scientifically possible to

compare soil samples. A color comparison test and a density comparison test of the various soil samples had been conducted. The color comparison test is made by putting sifted powdered soil between two glass slides and viewing it by use of a stereo microscope; the other test is made by putting soil samples in glass tubes containing liquids of various intensities and allowing the soil particles to drift downward until they come to rest in the layer of liquid possessing the same density as the particles. In short, the witness testified that the testings of the soil sample taken from defendant's shoes and the soil sample taken from inside the warehouse showed them to being "very, very close" to being the same. The exhibit of which defendant now complains was a black and white "photograph of the completed density comparison" test conducted by Mr. Brizendine.

The difficulty we find with defendant's now saying that Mr. Brizendine was not properly qualified as a witness and that the sample testing methods employed were not reliable, is that defendant at trial did not once voice an objection stating these reasons nor does defendant here claim there was an abuse of discretion in admitting the opinion testimony. Defendant objected to Mr. Brizendine giving his determinations of the color comparison testing because the question "calls for a conclusion and there have not been enough facts admitted to form a basis for any conclusion by this witness at this time." Of course, an expert's opinion is a conclusion but the objection made does not voice any doubt of the ultimate qualification of Mr. Brizendine to state his opinion. An objection that an expert opinion is a conclusion and hence invades the province of the jury is not a valid one. Furthermore, an opinion by a qualified expert is evidence and the province of the jury is to hear and weigh all evidence, including opinion evidence, and decide the issues. Mr. Brizendine expressed the same opinion based upon the density comparison testings with-

out objection, so that in any event, the opinion predicated on the color comparison tests would not have constituted prejudicial error. State v. Menard, 331 S.W.2d 521, 524[1–3] (Mo.1960).

Defendant's at-trial objection to the photograph was that "it is just a picture of what his report is or what his conclusions are, and I don't see any reason why we have to have a photograph of it if he can state what those conclusions and results are." Photographs are not inadmissible simply because a witness may orally describe what the pictures illustrate [State v. Stevens, 467 S.W.2d 10, 24[17] (Mo.1971), cert. denied 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546 (1971)], and photographs, if they help clarify and corroborate the testimony of witnesses, are admissible. State v. Smith, 485 S.W.2d 461, 468[15–16] (Mo.App.1972). Admission of photographs rests largely within the sound discretion of the trial court [State v. Crawford, 416 S. W.2d 178, 187[11] (Mo.1967)] and we can think of nothing less inflammatory than a black and white photograph of six glass tubes containing dirt samples resting at various levels on clear liquids of various intensities. The trial court did not abuse its discretion by admitting the picture into evidence.

## VI

Defendant's last point that "[t]he State failed to establish defendant's guilt beyond a reasonable doubt and the verdict was against the greater weight of the evidence," is a blatant abstraction condemned by Rule 84.04(d). An assignment that "the verdict was against the greater weight of the evidence" is wholly insufficient as a point for consideration on appeal. State v. Jackson, 477 S.W.2d 47, 53[11] (Mo.1972); City of St. Joseph v. Blakley, 486 S.W.2d 511, 513[1] (Mo.App. 1972). Nevertheless, to consider whether the evidence supports a verdict of defendant's guilt, defendant spotlights the testi-

mony of his sole witness—his mother. She related that the defendant was home with her from 3 to 9 p.m. on the date in question, giving rise to the possible inference that defendant could not have participated in the warehouse burglary which must have occurred before he left home. However, the jury, not the defendant, determines the credibility of the witnesses, and it was within the province of the jury to disbelieve defendant's alibi witness. State v. Hill, 438 S.W.2d 244, 248[9] (Mo.1969). Upon appellate review, even in cases where the evidence is wholly circumstantial, the evidence tending to support the verdict must be considered to be true, contrary evidence must be disregarded, and every reasonable inference in support of the verdict must be indulged. State v. Webb, 423 S.W.2d 795, 799[6] (Mo.1968). So considering the evidence in this case, we have a situation where defendant, together with others, was found inside a home not his own, in possession of shirts recently stolen from Dillard's warehouse. An inference of guilt is permissible from the unexplained possession of property recently stolen in a burglary, and the inference exists both as to the offense of burglary and of stealing. State v. Fields, 442 S.W.2d 30, 35[10] (Mo.1969); State v. Kennedy, 396 S.W.2d 595, 598[2] (Mo.1965); State v. Durham, 367 S.W.2d 619, 621[2] (Mo. 1963). Proof of actual manual possession by the defendant of recently stolen property is not necessary to raise the inference [State v. Cobb, 444 S.W.2d 408, 413 (Mo. banc 1969)], and the possession by defendant need not be separate and apart from all others. State v. Freeman, 489 S.W.2d 749, 752[5] (Mo.App.1973). When taken together with all the other testimony, the evidence of defendant's possession of recently stolen property was sufficient to make a case for the jury and supports the verdict returned.

The judgment is affirmed.

STONE, HOGAN and BILLINGS, JJ., concur.