STATE of Missouri, Respondent,

v.

Milton GRIFFIN, Appellant.

No. 69733.

Supreme Court of Missouri,
En Banc.

July 26, 1988.

Rehearing Denied Sept. 13, 1988.

Melinda K. Pendergraph, Columbia, for appellant.

William L. Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Chief Justice.

Defendant Milton Griffin was convicted of two counts of first degree murder, *§ 565.020, RSMo 1986,* for the killing of two robbery victims, Loretta Trotter and Jerome Redden. The jury assessed defendant's punishment at life imprisonment without eligibility for probation or parole for the killing of Trotter but was unable to agree upon defendant's punishment for the killing of Redden. The trial court assessed defendant's punishment for the killing of Redden at death. Affirmed.

Defendant has not preserved any challenge to the sufficiency of the evidence to

support his convictions. However, it is useful to set forth the facts and reasonable inferences arising therefrom which the jury could reasonably have found in arriving at its verdict, ignoring evidence and inferences to the contrary. *See State v. Griffin*, 662 S.W.2d 854, 855 (Mo. banc 1983), *cert. denied*, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984).

On the afternoon of August 14, 1986, George Vance, Ray Mitchell, Darren Walters, David Shed, and defendant met Antoine Owens at Owens' residence. Owens told the others about a plan he and defendant had to rob Jerome Redden of some stereo equipment which Redden kept in an apartment he shared with Loretta Trotter and their four month old son. This apartment was located above Redden Cleaners, which was owned by Redden's mother. Owens knew about the stereo equipment because his girlfriend, Pamela Trotter, was Loretta Trotter's sister and he and Pamela had often visited Redden and Trotter's apartment. Mitchell, Walters, and Shed agreed to go along with Owens and defendant to help them remove the stereo equipment from Redden and Trotter's apartment. Vance refused to take part. At some time during that afternoon or evening, Owens said he was going to "ice" (kill) Redden and Trotter during the robbery because they knew him.

After dark, the five participants took two cars, one of which had been stolen, and drove to Redden and Trotter's apartment. While waiting for a restaurant across the street to quiet down, they all got into one car where defendant and Owens passed a handgun back and forth.

When the street cleared defendant and Owens went to the door that led upstairs to the apartment over Redden Cleaners and knocked. Redden, calling down from a window, asked who it was. Owens identified himself and told Redden that he and defendant needed a ride home. Redden came down to take the two men home but defendant asked to use the bathroom before they left. Redden called up to tell Trotter that defendant and Owens wanted to come up. She told Redden not to let anyone in. Defendant asked Redden to go back up and get her to change her mind. Redden relocked the door and went to talk to Trotter. While Redden was gone, Owens handed defendant the gun they had been passing back and forth earlier and told defendant to use it to gain entry to the apartment when Redden returned. When Redden came back down he told defendant and Owens that Trotter still did not want them to come in. Then, as Redden was coming out the door to take the two men home, defendant and Owens pushed Redden back and forced their way upstairs into the apartment. Although defendant, in his statement, denied using the gun to threaten anyone at this time, or any other time, the jury could reasonably have disbelieved this and inferred from the evidence that defendant used the gun from this point in the robbery on to compel Redden and Trotter to do his and Owens' bidding.

Defendant and Owens, taking Redden with them, went up into the apartment and announced that this was a robbery. Redden and Trotter were ordered to lie on the floor in the living room. Trotter begged the two not to hurt them. She also tried to get up while screaming that her baby was in the apartment. While defendant and Owens tried to keep her on the floor, Redden yelled, "don't hurt her, don't hurt her." Defendant decided that Redden and Trotter needed to be tied up. When Trotter continued to yell after defendant tied her with an extension cord, he told Owens to take Redden into the kitchen. After they had gone, defendant grabbed Trotter from behind and applied pressure to the side of her neck in a choke hold until she passed out.

Defendant then went into the kitchen where he began to tie Redden. Redden began yelling, "don't hurt her, don't hurt her" again. At this time defendant heard Owens and Trotter struggling in the living room and he returned to that room where he saw that Trotter had freed herself from her bindings. After Trotter was subdued, defendant retied her with strips torn from a sheet.

Defendant then went back into the kitchen to find out from Redden "where the

money was." Redden was still yelling "don't hurt her." At this time, the jury could reasonably believe that defendant began strangling Redden with an electrical cord and strips of torn cloth to keep him quiet because Redden's body was found with an electrical cord, entwined with several fragments of torn cloth, tied around the neck in a constricting manner. The medical examiner also found small pinpoint hemorrhages on Redden's body's lower eyelids which indicated that significant pressure was applied to Redden's neck while he was alive.

About this time, Trotter was stabbed twice in the lower chest and four times in the throat with a steak knife. One of the knife wounds to her chest penetrated about three inches and entered the heart. The wounds to the throat resulted in a ⅕ inch hole in Trotter's jugular vein. The medical examiner testified that the wound to Trotter's heart caused her death, but that none of her wounds would have resulted in instantaneous death. In his statement, defendant stated that Owens had stabbed Trotter in the throat while he was in the kitchen with Redden and that he had had nothing to do with her death. Defendant's statement does not account for the wounds to Trotter's chest. The jury could reasonably have discredited defendant's self-serving and incomplete story and believed instead that defendant and Owens had acted in concert to kill Trotter.

While defendant and Owens were in the living room with the bleeding Trotter, Redden was struggling against his bindings in the kitchen and hollering "what's going on man, what's going on." Defendant went back to the kitchen, grabbed a wrench, put his knee in Redden's back, and hit Redden in the back of the head with the wrench. Defendant stated that he hit Redden with the wrench only after Redden had freed his hands, picked up the wrench, and tried to hit defendant with it. Again, the jury could reasonably have disbelieved defendant's self-serving explanation and believed instead that defendant had meant to deliberately execute Redden.

The blow with the wrench knocked Redden out. Owens then stabbed Redden twice in the throat with the steak knife without managing to hit any major arteries or veins. Before Owens could strike again Redden came to and began struggling. While defendant tried to restrain him, Owens stabbed Redden twice in the abdomen, penetrating his liver. These wounds caused Redden to stop struggling and defendant used this opportunity to resecure Redden's bindings. Redden then started to struggle again. Defendant took a butcher knife and stabbed Redden four times in the chest, penetrating up to three inches into his left lung. Redden struggled no more.

The medical examiner testified that the cause of Redden's death was the blow to the back of his head. Death, however, was not necessarily quick. He doubted that any of the stab wounds would have been fatal.

After insuring that Redden and Trotter would bother them no more, defendant and Owens began gathering up stereo and television equipment to take out of the apartment. In the course of this activity, defendant took sheets and covered Redden and Trotter. Redden was still breathing when defendant put the sheet over him. Seeing the wrench with which he had struck Redden, defendant picked it up, wiped it off on the sheet with which he was covering Redden, and pitched it in the trash can.

Thirty minutes after defendant and Owens had entered the apartment, Owens came out carrying a potato chip bag in which he had placed the knives used to stab Trotter and Redden. Owens got into the car in which Ray Mitchell was sitting and they drove around the block, apparently to dispose of the knives. When they returned a short time later Owens told Darren Walters and David Shed to help defendant bring out Redden's stereo and television equipment. Defendant came out about this time and unlocked a van owned by Redden Cleaners with keys he had taken from Redden's pocket. Defendant, Walters, and Shed then loaded the van with the stereo and television equipment while Owens and

Mitchell waited in the car. Before these three finished putting all the equipment in the van, four or five people came out of the restaurant across the street. This caused the whole group to decide to leave immediately. They left four speakers sitting in the hallway of the apartment. Redden and Trotter's baby also was left, unharmed, in the apartment.

The group drove back to Owens' house, taking three vehicles—the two cars which they had taken to Redden and Trotter's apartment and the Redden Cleaners van. After reaching the house, both Owens and defendant changed their bloodstained clothes. The group then took the stolen equipment to the home of Arulise Owens, Antoine Owens' cousin, to store it. While at Arulise's house, defendant told the others that he had "busted the guy's head, hit him in the head with a wrench." When they had finished unloading the equipment, defendant drove the van to a vacant lot and then returned to Arulise's house with Mitchell, who had followed defendant to the lot. Then defendant, Owens, Mitchell, Walters, and Shed drove back to the lot, buying some gasoline on the way. Defendant asked the others who was going to burn the van. When no one else volunteered, defendant complained that he had to do everything, got out of the car by himself, doused the van with the gasoline, and set it on fire.

About four days later, Pamela Trotter, Loretta Trotter's sister and Antoine Owens' girlfriend, overheard a conversation in which defendant recalled how he beat Jerome Redden with a wrench and Antoine Owens told how he stabbed Loretta Trotter. Pamela and her family reported what she had overheard to the police. Subsequently, the police arrested Antoine Owens, Arulise Owens, and George Vance. After these arrests, defendant called Antoine Owens' mother, Everjean Taylor, and told her that the police had arrested the wrong men. He then went in person to Taylor's house and told her that Antoine, Arulise, and George had done nothing. When she asked who did kill Redden and Trotter, defendant said, "I did it. I stabbed the mother fuckers." He also said

he was going to kill Pamela Trotter for talking to the police and Tony Washington for spreading rumors that Antoine Owens had killed Redden and Trotter. Taylor informed the police of defendant's statements and, with her cooperation, the police arrested defendant the next night. He was released pending further investigation, but was rearrested the next morning.

■ Defendant first contends two venirepersons should have been excused for cause because they indicated that they expected defendant to offer evidence in his own behalf. Venireperson Kloud stated on voir dire that she expected to hear defendant's side of the story, although not necessarily from the defendant, and that she "would like to hear some evidence" from the defense. The defense attorney asked Kloud if she was saying she could not presume defendant innocent. Kloud replied: "No, no, I'm not saying that." Then Kloud was asked if she could presume defendant innocent even if he chose not to testify or to put on other evidence. She answered: "I think so." Venireperson Brewer, in response to a question concerning whether he would think defendant guilty if he chose not to testify, stated:

> He's more apt to be guilty. You're asking for my personal feelings. I'm sorry, but I would think so. I don't know the law, I don't know any reason why he wouldn't testify. That's just my opinion.

Brewer was then asked by both the prosecutor and the defense attorney if he could put aside his personal opinion and follow the law that he was to make no inference from a decision by defendant not to testify. His response to both questions was "yes." He then volunteered this statement:

> You asked for my personal feelings and that's what I told you. But at the same time I would follow the instructions.

That the burden of proof is on the state is a cardinal principle of criminal law. A venireperson that cannot follow this principle must be excused for cause. Similarly, a venireperson must be stricken for cause if he indicates that he might draw adverse inferences from a defendant's decision not

to testify. *State v. Holland,* 719 S.W.2d 453, 454–55 (Mo. banc 1986). However, a juror who expresses a personal opinion that a defendant should testify or present some evidence in his own behalf is not necessarily disqualified as a juror. If it appears reasonable to the trial court that the venireperson's opinion will yield and that he will determine the issues under the law, the venireperson is not subject to being excused for cause. *Cf. State v. Wilson,* 436 S.W.2d 633, 638 (Mo.1969) (venireperson who has formed opinion as to guilt or innocence of accused from rumor or newspaper reports not subject to being excused for cause if it appears to trial court that this opinion will yield to the evidence adduced at court). The trial court possesses broad discretion in determining whether the prospective juror is qualified to serve. *State v. Lingar,* 726 S.W.2d 728, 733 (Mo. banc), *cert. denied,* — U.S. —, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987).

Here, Venirepersons Kloud and Brewer did express personal opinions that defendant should present evidence in his own behalf. Brewer, however, unambiguously stated that he could lay aside his personal feelings and follow the law. Kloud also indicated that she could presume defendant innocent if he chose not to present any evidence despite her desire to hear evidence from the defense. Her response "I think so" was not equivocal given its context. "I think so" is common vernacular to express an affirmative response. *See State v. Mercer,* 618 S.W.2d 1, 7 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed. 2d 240 (1981). The trial court, which had the opportunity to view the demeanor of Kloud and Brewer, did not abuse its discretion in refusing to excuse them.

■ Defendant asserts the trial court should have quashed the jury panel because the prosecutor used five peremptory challenges to exclude blacks from the jury in violation of the equal protection clause of the United States Constitution. Defendant says that, at the very least, the court should have required the prosecutor to provide neutral explanations for his challenges.

In *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–1723, 90 L.Ed. 2d 69 (1986), the United States Supreme Court established the following standards by which courts are to determine whether prosecutors exercised their peremptory challenges in a racially discriminatory manner:

> To establish [a *prima facie* case of discriminatory use of peremptory challenges], the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact ... that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia,* 345 U.S. [559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race....
>
> ....
>
> Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.... The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

This Court, in *State v. Antwine,* 743 S.W. 2d 51, 64 (Mo. banc 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), expanded upon *Batson* by directing trial courts to consider, in the process of determining the existence of the third element of the *prima facie* case, the prosecutor's explanations of his peremptory strikes.

In this case, defendant established the first element of a *prima facie* case. Defendant is black. After challenges for cause, the venire consisted of twenty-five whites and nine blacks. The prosecutor peremptorily struck five whites and four

blacks and further struck one black alternate. Defendant used two peremptory strikes against blacks, leaving two blacks to serve on the jury. One of the victims here, Trotter, was black, and the other, Redden, was white.

As to the second element, this Court has confidence that the trial judge recognized that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" The trial judge devoted a considerable amount of time and concern to this issue.

With respect to the third element, defendant urges that the trial court failed to follow the directive of *Antwine* to consider the prosecutor's explanations of its peremptory challenges in its determination of the existence of this element. The reason the trial court did not follow *Antwine*'s directive is simple. *Antwine* was handed down by this Court more than five months after the trial in this case. Although *Batson* has a limited retroactive effect, *see Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 710, 93 L.Ed.2d 649 (1987), the language used in *Antwine*, "[w]e ... direct," indicates that its expansion of *Batson* is to be applied prospectively only. This Court does not expect trial court's to foresee the future and follow directives before they are announced. Because *Antwine* is inapplicable to this case, the trial court's determination that defendant had not established a *prima facie* case is to be reviewed under the *Batson* standards only. Thus, the prosecutor was not required to come forward with neutral explanations for his peremptory strikes unless defendant established, by his evidence alone, circumstances which raised an inference that the prosecutor racially discriminated in his use of peremptory challenges.

Defendant points to no particular conduct on the part of the prosecutor which indicated racial motivation for his peremptory challenges except the bare recital that, although blacks made up approximately 26% of the venire after challenges for cause, the prosecutor used 50% of his peremptory strikes against blacks. While evidence of a pattern of strikes against blacks can be indicative of racially motivated peremptory challenges, *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, that is not the case here. Three blacks remained on the venire after the prosecutor exercised his peremptory challenges. That three blacks who could have been peremptorily struck by the state were not so stricken undercuts any inference of impermissible discrimination. *See United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). The state is not required to adhere to a specific mathematical formula in the exercise of its peremptory challenges. *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir.1987).

■■■ A reviewing court may not reverse a trial court's decision as to whether the prosecutor discriminated in the exercise of his peremptory challenges unless it finds that decision clearly erroneous. *Antwine*, 743 S.W.2d at 66. Given the minimal evidence supporting defendant's claim of discriminatory strikes, the trial court's conclusion that defendant had not established a *prima facie* case of discrimination is not clearly erroneous.

■■■ Defendant next contends that the trial court erroneously admitted a knife, found in the burned out interior of the Redden Cleaners van, into evidence. Some testimony indicated that the knives used against the victims were disposed of by Antoine Owens about a block from the crime scene. Defendant asserts that the knife found in the van had no connection with the charged offenses and served only to inflame the jury.

Demonstrative evidence is admissible "if it throws any relevant light upon a material matter at issue." *State v. Murphy*, 592 S.W.2d 727, 730 (Mo. banc 1979). A physical object found at or near the scene of the crime, and of a type that could have been used to deliver a felling blow, cannot be said to have no relevancy or probative value. *State v. Lashley*, 667 S.W.2d 712, 714 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). In *Lashley*, this Court found admissible a small

hammer recovered at the crime scene even though there was no evidence that it had been used to assault the victim. *Id.*

The knife at issue here was found in a van discovered some distance away from the bodies of the victims, but at the time of the murders the van was parked next to the victims' apartment. While the van was still next to the crime scene, defendant was loading electronic equipment into it. The van was not near the crime scene when it was discovered only because defendant or an accomplice drove it away. The rule from *Lashley* applies in these circumstances and thus it cannot be said that the knife has no relevancy or probative value. Moreover, the jury reasonably could have disbelieved the testimony that all the knives used against the victims were disposed of and inferred that the knife at issue here, found in a place where defendant had been immediately after the murders, was associated with the crime. The identification of a weapon associated with a case "need not be positive, absolute, certain or wholly unqualified." *State v. Davis*, 677 S.W.2d 370, 372 (Mo.App.1984).

The admission of demonstrative evidence is a matter resting within the discretion of the trial court. *Murphy*, 592 S.W.2d at 730. The trial court did not abuse this discretion in admitting the knife found in the Redden Cleaners van.

■ Defendant also argues that the trial court abused its discretion in admitting numerous items of evidence discovered at or near the crime scene, in admitting certain photographs of items found there, and in admitting testimony relating to this evidence. He contends that the challenged evidence was irrelevant in that it in no way connected him to the crime and was introduced to mask the weakness of the state's case and divert the jury's attention from the issues in dispute. Some of the challenged evidence, including such things as lifts of fingerprints from the victim's stereo equipment and fingernail scrapings from both victims, did not link defendant to the crime. The evidence was relevant, however, to show the condition of the crime scene and the nature of the police investigation. In any event, even had the evidence been irrelevant, defendant could hardly have been prejudiced by evidence showing no connection between himself and the crime. There was no abuse of discretion in the trial court's admission of the evidence challenged here.

■ Defendant further argues that the trial court abused its discretion in permitting Rosie Redden, the mother of one of the victims, to testify because her testimony was irrelevant and was adduced only to engender sympathy for the victim's family. Contrary to defendant's claim, Mrs. Redden's testimony was relevant. She identified, from photographs, stereo equipment and a television which had been recovered in this case as belonging to the victim. She also described, and then identified, a watch which had been sold by defendant to another as being her son's. Although other witnesses established that the victim owned the stereo equipment, the television, and the watch, the state, having the burden of proving defendant's guilt beyond a reasonable doubt, should not be unduly limited in its quantum of proof. *State v. Moore*, 303 S.W.2d 60, 65–66 (Mo. banc 1957). Mrs. Redden did become upset and begin to cry on the stand, but the trial court immediately called a recess. After the recess, Mrs. Redden remained composed and gave her testimony. There was no abuse of discretion by the trial court.

■ Defendant argues his statement to the police should have been suppressed because it was the fruit of an arrest which was illegal because the police had no probable cause to arrest him. Defendant further contends that, even if probable cause did exist, the arrest was improper because the police arrested him in his home without a warrant and without obtaining valid consent to enter.

Suspicion focused on defendant when Everjean Taylor, the mother of Antoine Owens and the aunt of George Vance and Arulise Owens, contacted the police and told them that defendant had come to her home after the arrest of her son and her nephews and told her that he had killed Redden and Trotter and that Antoine,

George, and Arulise were not involved in the crime. Terrence Taylor, Everjean's son and Antoine's brother, also told the police that defendant admitted to him that he was the killer. At this time, the police investigation of the homicides had already indicated that more people than those already in custody had been involved.

The next day, Everjean told the police that defendant was returning to her home that night. The police set up an observation across the street from Taylor's home in order to arrest defendant and question him about the statements he had made. When defendant arrived at the Taylor home, Everjean admitted the officers. Before the officers entered, defendant began to flee. He was apprehended as he was climbing out the back window of an upstairs bedroom and arrested. After being questioned, defendant was released pending further investigation. He was arrested again the next day at his home. It was subsequent to his second arrest that defendant gave the statement at issue here.

Probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officers, and of which they have reasonably trustworthy information, are sufficient to warrant a reasonably cautious person to believe that the person to be arrested has committed the offense. *State v. Giffen*, 640 S.W.2d 128, 131 (Mo. 1982). Probable cause does not require that an informant be one whose reliability has previously been established. The true inquiry is whether the informant's present information is reliable. If corroborated through other sources, the information, even though hearsay, may form the basis of probable cause for an arrest. *State v. Wiley*, 522 S.W.2d 281, 288 (Mo. banc 1975).

Here, there was cause to question the reliability of Everjean and Terrence Taylor's statements that defendant admitted being the killer of Redden and Trotter. Antoine Owens, Everjean's son and Terrence's brother, was in custody for the same killings at the time they provided their information to the police. Their information, however, was corroborated from other sources. The police investigation al-ready led the police to believe they had not arrested everyone involved in the homicides. Additionally, defendant attempted to flee when the police arrived at the Taylor home. Flight from the authorities is a circumstance that may be considered in determining the existence of probable cause. *See State v. Novak*, 428 S.W.2d 585, 591 (Mo.1968). Given the combination of these circumstances, probable cause to arrest defendant did exist at the time of his first arrest. Although defendant was released for a time after this initial arrest, the probable cause for his arrest had not dissipated when he was rearrested the next day.

 Moreover, the warrantless arrest of defendant in his home was not improper. A warrantless arrest in a suspect's home is permissible if the arresting officer has been given consent to enter. *State v. Murray*, 744 S.W.2d 762, 771 (Mo. banc 1988). In this case, the arresting officer was invited into defendant's home by his thirteen year old sister, Kendra Griffin, who also resided there. The officer did not think defendant would be there, but instead wanted only to ask his mother about his whereabouts. Immediately upon entering the house the officer saw defendant lying on the couch and placed him under arrest. Kendra was of a sufficient age to have authority to consent to the entry of common areas of the house. *See Davis v. United States*, 327 F.2d 301, 304 (9th Cir. 1964) (Eight year old had authority to consent to entry of home she shared with her parents).

There was also testimony from Kendra and a friend of hers who was present when the arresting officer arrived that she had not invited the officer in. The credibility of witnesses at a suppression hearing is a question for the trial court and the court's ruling on that question should not be disturbed where it is supported by substantial evidence. *State v. Battle*, 661 S.W.2d 487, 491 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). The arresting officer's testimony that Kendra did invite him in is substantial evidence

supporting the trial court's ruling that he entered defendant's home with consent.

 Defendant's next point is his assertion that the jury should have been instructed on the lesser included offense of second degree felony murder with respect to each count. Trial courts are obligated to instruct on lesser included offenses supported by the evidence. *Section 556.046, RSMo 1986. See also Beck v. Alabama,* 447 U.S. 625, 635–43, 100 S.Ct. 2382, 2388–92, 65 L.Ed.2d 392 (1980). Although second degree felony murder is not a lesser included offense of first degree murder under the traditional "elements test," *State v. Baker,* 636 S.W.2d 902, 904 (Mo. banc 1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983), it has been specifically denominated as such, *see §§ 556.046 and 565.025, RSMo 1986.*

As the evidence in this case of defendant's state of mind was not conclusive, it did support an instruction on second degree felony murder and the trial court should have so instructed the jury. Defendant, however, was not prejudiced by the court's failure to do this. The jury *was* instructed on the lesser included offense of second degree conventional murder. It is a second degree conventional murder instruction, not a second degree felony murder instruction, which sufficiently tests a jury's belief of the crucial facts for a conviction of first degree murder. *Baker,* 636 S.W.2d at 905 (court uses terms "capital murder," "first degree murder," and "second degree murder," but these terms are the equivalent, respectively, of the terms "first degree murder," "second degree felony murder," and "second degree conventional murder" as used here). The jury had the opportunity to convict defendant of second degree conventional murder but did not do so. An additional instruction on second degree felony murder would have made no difference.

 Defendant claims the trial court erred in precluding Dr. Scott Decker from testifying in the penalty phase of the trial that the death penalty does not deter homicides. Defendant claims Dr. Decker's proposed testimony was admissible because it would have focused on the specifics of his case and thus would have assisted the jury in imposing a rational sentence. This Court has held that a defendant's proposed testimony concerning the general deterrent effect of the death penalty would have been irrelevant because it "would not have focused upon the specifics of the defendant's case." *State v. Gilmore,* 681 S.W.2d 934, 941 (Mo. banc 1984).

Defendant here, however, analogizes Dr. Decker's proposed testimony to that of Warden Armontrout which was admitted in *State v. Amrine,* 741 S.W.2d 665, 669–70 (Mo. banc 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988). This Court held in *Amrine* that the trial court's admission of Armontrout's testimony as to the deterrent effect of the death penalty "in the unique setting of a correctional institution" was not plain error. *Id.* at 669. *Gilmore* was found inapplicable because Armontrout's testimony, based on his first hand observations during a lengthy career as a correctional officer, pertained to the specific environment in which the defendant committed the murder and was relevant to two of the submitted aggravating circumstances, i.e., whether at the time of the murder the defendant was in the lawful custody of a place of lawful confinement and whether the victim was an inmate at a correctional institution. *Amrine,* 741 S.W.2d at 670. Armontrout's testimony was found relevant to these aggravating circumstances because it aided the jury in assessing the weight to give them by providing an explanation as to why such circumstances are considered aggravated. *Id.*

In an offer of proof, Dr. Decker testified that he and a colleague conducted a statistical analysis of the deterrent effect of the death penalty in Missouri. This study focused on the time period 1933–80 and on males between the ages of 15 and 29. The researchers found no deterrent effect from the death penalty on the age group studied. Defendant urges that Dr. Decker's testimony, just as that of Warden Armontrout in *Amrine,* pertained to the specific environment in which the murder was committed

in that it was limited to a particular class of people in which defendant was included. There are, however, significant differences between the proposed testimony of Dr. Decker and that of Warden Armontrout.

Dr. Decker's study looked at all males in Missouri between the ages of 15 and 29 without distinguishing them by the environment in which they lived, whereas Armontrout's testimony related to the specific environment in which the murder was committed. In addition, the number of prisoners in Missouri is much smaller than the number of Missouri males between the ages of 15 and 29. As of July 1, 1986, about the time Armontrout testified in the *Amrine* case, the population of all state adult correctional institutions was 10,229. Official Manual, State of Missouri 1987–88, at 342–43. By contrast, as of April 1, 1980, the final year of the period studied by Dr. Decker, the number of Missouri males between the ages of 15 and 24 alone was estimated at 455,000. U.S. Bureau of the Census, Current Population Reports, Series P–25, No. 1024 (1988).

The focus of Warden Armontrout's testimony on a relatively small class all of whose members lived in the same or a similar controlled environment as the defendant in *Amrine* made it relate quite specifically to that defendant's case. Dr. Decker's proposed testimony, based on a relatively large class whose members were undifferentiated according to environment, is of a different order. While it may be more specific than the proposed testimony found irrelevant in *Gilmore,* it nonetheless fails to center specifically enough on the defendant here or the particular conditions in which he lived.

Quite apart from its lack of specificity, Dr. Decker's proposed testimony is simply irrelevant. Unlike Warden Armontrout's testimony in *Amrine,* Dr. Decker's testimony would not have aided the jury in assessing the submitted aggravating and mitigating circumstances or any other issue properly before it. Defendant did submit his age as a mitigating circumstance and Dr. Decker's study did consider an age group of which defendant was a part in his study, but the study in no way purported to explain why the age of those in the group studied should be considered a mitigating factor. As the proposed testimony was not tied to the issues, its introduction would have improperly opened the penalty phase of the trial "as a forum for general debate on the attributes of capital punishment." *Gilmore,* 681 S.W.2d at 941. The trial court did not err in precluding Dr. Decker from testifying before the jury.

The next issue is defendant's claim that the trial court erred in declining to submit the "hammer" instruction, MAI–CR 3d 312.10, when the jury, after deliberating for three hours and forty-five minutes in the punishment stage *returned a verdict* for Count II (relating to the killing of Redden) informing the court that it was unable to agree upon the punishment.

In the run-of-the-mill single stage criminal case the "hammer instruction" may be given in the discretion of the trial court, *State v. Anderson,* 698 S.W.2d 849, 853 (Mo. banc 1985), "when the length of deliberation or communication from the jury causes the court to believe that the jury may be deadlocked," MAI–CR 3d 312.10 Note on Use 2. Such an instruction encourages the jury to reach a verdict by urging jurors to respect the opinions of fellow jurors and to be unafraid to change their opinion if the discussion persuades them that they should. The instruction, however, also tells jurors they should not change their views against their consciences.

However, § 565.030.4, RSMo 1986, states that when a jury is to determine punishment in a first degree murder trial "it shall be instructed before the case is submitted that *if it is unable to decide or agree upon the punishment the court shall assess and declare the punishment.*" (Emphasis added.)

This statute permits a jury in the penalty phase of a first degree murder case to embody a deadlock in a *verdict* informing the court that it cannot agree upon punishment. By requiring the jury to be so instructed before deliberations begin, the statute empowers the jury to determine for

itself when it is deadlocked to such an extent that a decision cannot be reached. Thus, § 565.030.4 effectively withdraws any authority a trial court might have had to issue the "hammer" instruction in the *penalty* phase in a first degree murder case. For a court to submit the "hammer" instruction and order a jury back for further deliberations after it had returned the legislatively authorized *verdict* announcing it had been unable to agree upon punishment would be for it to require the jury to perform a role the legislature had not intended for it. Such action by the court would also undermine the purpose of § 565.030.4. In enacting this statute, the legislature apparently was seeking to avoid any risk of coercing a jury into reaching a reluctant decision which would result in an arbitrary and capricious sentence. Rather than run such a risk the legislature preferred that the court impose the punishment.

Here, Instructions 9 (as to murder of Trotter) and 15 (as to murder of Redden), followed *MAI–CR 3rd 313.48* which tracks § 565.030.4, and told the jury that they could return verdicts of (1) death, (2) imprisonment for life without eligibility of probation or parole, or (3) that they were unable to agree upon punishment. The separate verdict forms followed *MAI–CR 3rd 313.58*, were in proper form, signed by the jury foreman, returned to and read in open court, and assessed defendant's punishment at life imprisonment without eligibility of probation or parole for Trotter's murder; and declared they were "unable to decide or agree upon punishment" of defendant for Redden's murder. Thereafter, defendant requested the "hammer instruction" as to the verdict returned as to the murder of Redden—a verdict which is specifically authorized by § 565.030.4 in the punishment or penalty stage of the trial. There was no error and the point is denied.

■■■ Defendant also argues that the trial court erred in imposing upon him a death sentence for Redden's murder pursuant to Section 565.030.4 because that statute is unconstitutional in that it deprives defendants of the right to a jury trial as guaranteed by *Art. I, § 22(a)* of the Missouri Constitution.[1] This Court, however, has

> uniformly held that the right of trial by jury as guaranteed by the constitution is the same as the right that existed at common law and that at common law the jury determined the guilt or innocence of the accused and the court fixed the punishment.…
>
> … "[T]he laws of Missouri have always recognized that it is constitutional to authorize either court or jury to assess the punishment in a felony case."

*State v. Morton*, 338 S.W.2d 858, 861 (Mo. 1960) (quoting *State v. Hamey*, 168 Mo. 167, 180, 67 S.W. 620, 623 (banc 1902)).

Defendant urges that the bifurcated nature of first degree murder trials differentiates them from other trials and that the right to a jury should apply to both guilt and penalty phases. It is true that the two phases of a first degree murder trial are discrete and that each is subject to constitutional proscriptions, *State v. Bibb*, 702 S.W.2d 462, 464 (Mo. banc 1985), but this is of no help to defendant. There is no constitutional right to have a jury determine punishment whether the trial occurs in one phase or two. The two stage trial of first degree murder trials mandated by § 565.-030, RSMo 1986, did not increase the rights of defendants under the jury trial provision of the constitution.

■■■ Defendant also contends that the trial court's imposition of the death penalty pursuant to § 565.030.4 violated his right to procedural due process under the federal constitution in that it fails to provide adequate procedures for when the jury is deadlocked. First, defendant argues that the statute creates a legitimate expectancy that a jury will determine punishment but then permits the jury to immediately abdicate its responsibility by returning a verdict that it cannot agree upon punishment.

1. As there is no federal constitution right to jury sentencing, *Proffitt v. Georgia*, 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976), defendant raises no challenge under the federal constitution.

Because the statute clearly provides that the jury can return such a verdict, however, no expectancy is denied when this type of verdict is returned.

Second, defendant argues that § 565.-030.4 fails to provide guidance to a trial court which must determine punishment after the jury returns a verdict announcing it cannot agree upon punishment. On the contrary, the statute provides that the court shall follow the same four step process that a jury is instructed to follow in its determination of punishment.

■ Third, defendant argues that a jury which cannot agree upon punishment should be required to submit in writing a finding of the aggravating circumstances it found beyond a reasonable doubt. This is to ensure that the jury did find at least one aggravating circumstance before reaching an impasse as to the correct punishment. This argument ignores the fact that if the jury had not found at least one aggravating circumstance, the statute mandates it should have imposed a life sentence instead of returning a verdict announcing it could not agree upon punishment (which would permit the court to impose either a life or a death sentence). *Section 565.030.4(1)*. The jury instructions formulated to comply with the requirements of § 565.030.4(1), provide the assurance that the jury has found at least one aggravating circumstance. If the jury had not found the existence of any aggravating circumstance, it would have been required to impose a life sentence under *MAI–CR 3d 313.40*. Only if the jury had initially found the existence of an aggravating circumstance could it, under the instructions, return a verdict announcing that it was unable to agree upon punishment. It is presumed that juries follow their instructions. *State v. Preston*, 673 S.W.2d 1, 7 (Mo. banc), *cert. denied*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). As there is already assurance that a jury returning a verdict announcing it cannot agree upon punishment has made the prerequisite finding of at least one aggravating circumstance, procedural due process does not require the jury to submit the aggravating circumstances it has found in writing.

■ Fourth, defendant argues that the trial court should not have asked the jury for their numerical standing on the issue of punishment because the jury's vote may have prejudiced the tribunal by injecting an arbitrary factor into the sentencing decision. *Section 565.030.4* provides that, when the jury cannot agree upon punishment, the court must determine punishment independently and without reliance on the results of any deliberations of the jury. Thus, the jury division on punishment is irrelevant to the court's determination of punishment. Considering that the court was not informed which direction the jury was leaning, however, its knowledge of the jury's numerical division could not have affected the court's sentencing decision.

Finally, § 565.035.3, RSMo 1986, mandates that the Court conduct an independent review of the imposition of defendant's death sentence. That section requires the Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

The Court has carefully searched the record and concludes that defendant's death sentence for the murder of Jerome Redden was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Turning to the second prong of § 565.-035.3, the Court finds substantial evidence to support the trial court's finding of the existence of five statutory aggravating circumstances and three nonstatutory aggravating circumstances.

■ The discovery of the bodies of both Loretta Trotter and Jerome Redden in the apartment above Redden Cleaners and the reasonable inference that defendant and Antoine Owens acted in concert in the robbery and killing of Trotter and Redden warranted the court in finding that Redden's murder was committed while defendant was engaged in the commission of another unlawful homicide. *See § 565.032.2(1).*

■ The evidence that Owens said that he was going to kill Trotter and Redden because they knew him, combined with the evidence that defendant knew this was Owens' intent and went with him anyway, gives rise to the reasonable inference that it was also defendant's intent to kill Redden and Trotter to prevent them from identifying Owens and thereby being himself linked to the robbery. This reasonable inference supports the court's finding that Redden's murder was committed for the purpose of avoiding a lawful arrest of Owens or defendant. *See § 565.032.2(10).*

■ The trial judge also found the existence of both the aggravating circumstance that defendant murdered Redden for the purpose of receiving money or another thing of monetary value from Redden or Trotter, *see § 565.032.2(4),* and the aggravating circumstance that Redden's murder was committed while defendant was engaged in the perpetration of burglary and robbery, *see § 565.032.2(11).* Defendant argues that the trial court's consideration and finding of both these aggravating circumstances was improper because the same evidence establishes both circumstances and, thus, a single aggravating factor was counted against him twice. Identical arguments have recently been rejected. *See State v. Jones,* 749 S.W.2d 356, 365 (Mo. banc 1988); *State v. Walls,* 744 S.W.2d 791, 798–99 (Mo. banc 1988).

■ Both these aggravating circumstances were supported by the evidence. The evidence that Redden was killed after defendant and Owens had gone to his apartment to take his stereo and television equipment supports a reasonable belief that greed motivated the killing and thus supports the finding that defendant murdered Redden for the purpose of receiving money or another thing of monetary value from Redden or Trotter. Defendant's admission that he and Owens forced their way into the victims' apartment with the intent to steal Redden's stereo and television equipment, caused the injuries which resulted in the victims' deaths, and then took the equipment leaves no doubt that Redden's murder was committed while defendant was engaged in the perpetration of burglary and robbery.

■ Defendant also specifically challenges the trial court's finding of the aggravating circumstance that the murder involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman, *see § 565.032.2(7).* Defendant claims that this circumstance has not been given a sufficiently narrow construction to avoid arbitrary and capricious imposition of death sentences as required by *Godfrey v. Georgia,* 446 U.S. 420, 428–33, 100 S.Ct. 1759, 1764–67, 64 L.Ed.2d 398 (1980). This Court rejected a similar argument in *State v. Preston,* 673 S.W.2d 1, 10–11 (Mo. banc), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). In *Preston,* 673 S.W. 2d at 11, the Court stated:

In following the mandate of *Godfrey* to establish "clear and objective standards" as to what types of murders constitute "depravity of mind," this Court, while not expressly adopting a precise definition, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when the victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

Defendant contends that the recent case of *Maynard v. Cartwright,* —— U.S. ——, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), un-

dermines the validity of the reasoning in *Preston.* In *Maynard,* the United States Supreme Court examined the Oklahoma courts' application of that state's aggravating circumstance that a murder was "especially heinous, atrocious, or cruel." Oklahoma courts had considered "the attitude of the killer, the manner of the killing, and the suffering of the victim" to be relevant and sufficient to support the aggravating circumstance, but they had refused to hold that any one of those factors must be present for a murder to satisfy the circumstance. *Id.* at ——, 108 S.Ct. at 1857. The Court found this construction to be unconstitutionally vague because it was inadequate to provide a principled means to distinguish cases in which the death penalty is imposed from those in which it is not. *Id.* at ——, 108 S.Ct. at 1859. A reviewing court's conclusion that a particular set of facts surrounding a murder, no matter how shocking they might be, is not sufficient, absent some narrowing principle to apply those facts, to cure the infirmity of a vague aggravating circumstance. *Id.* at ——, 108 S.Ct. at 1859.

As in Oklahoma, this Court listed a number of factors to be considered in determining whether the trier's finding of the aggravating circumstance of depravity of mind was supported by the facts. However, unlike Oklahoma, this Court intended, and now expressly holds, that at least one of the factors set out in *Preston* must be present before a finding of depravity of mind will be found to be supported by the evidence. This limiting construction of the depravity of mind aggravating circumstance is sufficiently definite to provide a principled means to distinguish cases in which the death penalty is imposed from those in which it is not.

To further elaborate on *Preston,* the "brutality of defendant's conduct" and the "nature of the crime" factors which will be found to justify a finding of depravity of mind mean that the murder must involve serious physical abuse. For example, evidence that the murder victim or other victims at the murder scene were beaten or evidence that numerous wounds were inflicted upon a victim will support the ag-

gravating circumstance. The "mental state of defendant" factor means that the defendant must have acted with callous disregard for the sanctity of life as, for instance, where the defendant plans a robbery with the intent to kill all witnesses and has no apparent moral compunctions about such a course of action or where the victim was killed while helplessly bound, after being otherwise incapacitated, or after complying with all of defendant's demands without resistance.

■ The evidence supports the finding of the depravity of mind circumstance in this case. Both Redden and Trotter suffered strangulation as well as numerous other wounds. Redden at least had a substantial period of time to anticipate his death and also to endure the pain of his wounds. The trial court reasonably could have believed that both Trotter and Redden were bound when killed. Given the evidence that Antoine Owens stated before arriving at Redden and Trotter's apartment that they would have to be killed because they knew him and that, despite hearing this, defendant went with Owens to the apartment, the court also reasonably could have believed that defendant shared Owens' intent to kill Redden and Trotter so that there would be no one to link them with the robbery and that defendant had no moral compunctions about this course of action.

The introduction of court records also left no question as to the existence of the following nonstatutory aggravating circumstances, *see § 565.032.1(3):* (1) the defendant was convicted of stealing a motor vehicle on November 3, 1981; (2) the defendant pled guilty to second degree burglary on October 9, 1981; and (3) the defendant pled guilty to attempted second degree burglary on March 24, 1981.

■ The final prong of *§ 565.035.3* requires the Court to determine whether defendant's death sentence is excessive or disproportionate to the punishment imposed in similar cases considering the crime, the strength of the evidence, and the defendant. In this case the victims were gratui-

tously murdered in the course of a robbery. This Court has repeatedly affirmed death sentences in such cases. Of these cases, the following are the most similar to this one: *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988); *State v. Pollard*, 735 S.W.2d 345 (Mo. banc 1987), *cert. denied*, — U.S. —, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988); *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986); *State v. Foster*, 700 S.W.2d 440 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). The evidence which justifies the finding of the depravity of mind aggravating circumstance also shows that the murder of Redden was at least as heinous as the ones discussed in the cited cases. The trial judge's imposition of the death penalty in this case is neither excessive nor disproportionate.

The judgment is affirmed.

DONNELLY, ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

WELLIVER, J., concurs and concurs in Point I of separate concurring in part and dissenting in part opinion of BLACKMAR, J.

BLACKMAR, Judge concurring in part and dissenting in part.

I concur in the affirmance of the conviction. I am unable to concur in affirming the death sentence.

## I.

The fears I expressed in my concurring opinion in *State v. Amrine*, 741 S.W.2d 665 (Mo. banc 1987), have materialized. There the prosecution procured Warden Bill M. Armontrout to testify about the deterrent effect of death sentences for prison killings on other inmates who might be disposed toward violence. That case could have been disposed of by holding that reversal would not be decreed in the absence of objection to the testimony. The Court went further, however, and rhapsodized on the propriety of this evidence under the particular circumstances of a prison killing. I was not persuaded then, and am not now persuaded, that testimony of this kind is proper. What the Court approved of, in essence, was an argument by the warden in the middle of the penalty phase trial urging a capital sentence.

I cannot distinguish *Amrine* from this case. Here the offer of proof was confined to the facts of the case. The circumstance that the offer covered a broader segment of the population than in *Amrine* is not sufficient distinguishment. Nor is the argument that in *Amrine* the evidence tended to establish the aggravating circumstance of killing while in custody in a place of confinement persuasive. The legislature had already determined that the circumstance was aggravating, and any intelligent juror could sense the special problems of prison killings. The prosecutor may aid their consideration by argument. There is no need to present the warden as an authority figure. If we adhere to *Amrine*, which the principal opinion apparently does, then we should afford capital defendants similar opportunity to offer evidence about the deterrent effect of death sentences.

The Court, at the very least, should reject the broad holding of *Amrine* for future cases, by stating that no opinion evidence of the deterrent effect of capital punishment will be received in future cases. Otherwise Missouri justice, in capital cases, would appear to be somewhat less than evenhanded.

## II.

The defendant's first point on appeal reads as follows:

"The trial court erred in imposing a sentence of death for Count II pursuant to Sec. 565.030.4 because this statute is unconstitutional as it denies defendants the right to a jury trial as guaranteed by Article I, Section 22(a) of the Missouri

Constitution in that if the jury is unable to decide or agree upon punishment, the court is required to assess and declare punishment."

After reflection I have come to the conclusion that the point is well taken, given the Court's construction of the governing statute in this case and in *State v. Steward*, 734 S.W.2d 821 (Mo. banc, 1987). The pertinent portion of Article I, Sec. 22(a) of the Missouri Constitution reads as follows:

"That the right of trial by jury as heretofore enjoyed shall remain inviolate...."

The principal opinion properly demonstrates that jury sentencing is not an essential requirement of either the federal or the state constitution. In this respect there is no distinction between death sentences and other sentences. The present situation differs from any other which comes before the Court in that the jury is allowed to surrender its fact-finding authority to the Court. By the holding of the principal opinion this surrender is total and irrevocable, once the jury reports that it is unable to agree on the sentence. The judge may not remonstrate with the jury or return it for further consideration.

A death sentence is authorized only if there is a factual determination that one or more of the statutory aggravating circumstances exists. No death sentence may be directed unless the jury makes the required factual finding. In a situation such as we now have before us, however, the jury is forbidden to disclose such aggravating circumstances as it has found and the judge then undertakes factual findings on the same issues that the jury has previously considered. This delegation is unprecedented, and in my opinion represents too great a departure from "the right of trial by jury as heretofore enjoyed." I would concede that, for many years, judges have had the authority to determine the punishment when a jury in a single-stage trial agrees on guilt but cannot agree on the sentence. *State v. Brown*, 443 S.W.2d 805, 809–11 (Mo. banc 1969). In such cases, however, the jury has already determined all facts in issue. Here the court must redetermine facts previously submitted to the jury, on which it cannot agree. The right of trial by jury is substantially modified. There is no federal constitutional problem. I base my conclusion solely on the state constitutional provision quoted above.

In view of the firm position taken by the majority, I need not speculate as to whether the defects in the statute could be corrected by construction or by rule. Of course the majority sees no need for correction, and its views control.

### III.

Under *State v. Hopkins*, 687 S.W.2d 188 (Mo. banc 1985), the challenge for cause against Venireperson Brewer should have been sustained. The juror's unequivocal answer is more persuasive than his general assurance of willingness to follow the instructions. Only a rare individual would look a judge in the eye and admit that he or she would not be willing to follow instructions. The prudent course is to sustain the challenge for cause.

### IV.

The "torture or depravity of mind" aggravating circumstance is not necessary to the result, because other aggravating circumstances are found and adequately supported. My reservations about this aggravating circumstance, in the light of *Maynard v. Cartwright*, — U.S. —, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), are set out in my separate opinion in *State v. Smith*, 756 S.W.2d 493 (Mo. banc 1988).

### V.

I would not dispute the conclusion of the principal opinion that the death sentence is not disproportionate, and so would allow the state to retry the penalty phase of the Redden case, if this is desired.